Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org


Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> MARCELO FIORANELLI, JAY WORLEY, and JAVONY SPARKS; and DOES 1-25, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC

("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution

Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

### I.    <u>INTRODUCTION</u>

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties,

and remediation against Defendants MARCELO FIORANELLI, JAY WORLEY and JAVONY

SPARKS ("Defendants") for current and ongoing violations of the National Pollutant Discharge

Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.      On or about March 28, 2025, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants.

3.      A copy of Plaintiff's Notice of Intent to Sue dated March 28, 2025 ("Notice"), is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.

5.      Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.      This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.  PARTIES

**Plaintiff**

7.      Plaintiff is an environmental membership group organized under the laws of the State of California as a limited liability company.

**Defendants**

8.      Plaintiff is informed and believes, and on such information and belief alleges, that Defendant MARCELO FIORANELLI is the Chief Executive Officer and managing member of Airgas USA, LLC.

9.      Plaintiff is informed and believes, and on such information and belief alleges, that Airgas USA, LLC, doing business as Airgas NCN, is identified in the Water Board's records as the Industrial General Permit applicant/permittee and operator of the facility which is the subject

of this complaint, located at 6801 Florin Perkins Road, in Sacramento, California ("AIRGAS" or "AIRGAS facility").

10.    Plaintiff alleges that Defendant MARCELO FIORANELLI is legally and personally responsible under the Responsible Corporate Officer doctrine for the ongoing violations of the CWA and Industrial General Permit committed by individuals employed by the AIRGAS facility, as detailed in Plaintiff's Notice.

11.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant JAY WORLEY is the Chief Operating Officer of AIRGAS.

12.    Plaintiff alleges that Defendant JAY WORLEY is legally and personally responsible under the Responsible Corporate Officer doctrine for the ongoing violations of the CWA and Industrial General Permit committed by individuals employed by the AIRGAS facility, as detailed in Plaintiff's Notice.

13.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant JAVONY SPARKS is the Legally Responsible Person for purposes of Industrial General Permit compliance for the AIRGAS facility.

14.    Plaintiff alleges that Defendant JAVONY SPARKS is legally responsible for the ongoing violations of the CWA and Industrial General Permit personally committed by him during his employment as the Environmental Health & Safety Manager for the AIRGAS facility, as detailed in Plaintiff's Notice.

### III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

16.    Venue is proper because Defendant JAVONY SPARKS resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2).

Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## IV.  <u>ARTICLE III STANDING</u>

17.     Plaintiff is an environmental membership organization with associational members who reside in northern California.

18.     Plaintiff's status as a sole managing member limited liability company (as opposed to a non-profit corporation) is irrelevant to whether it has standing to bring this suit and is not dispositive of its ability to maintain its associational members.

19.     Plaintiff's organizational purpose is the protection, preservation and enhancement of the navigable rivers, lakes and oceans (and their tributaries) physically located in northern California.

20.     Plaintiff's organizational purpose is accomplished through enforcement of the provisions of the CWA and California's Industrial General Permit, in seeking redress against industrial business located in northern California who violate the CWA by failing to comply with all standard conditions of California's Industrial General NPDES Permit ("General Permit").

21.     The filing of this complaint is germane to Plaintiff's organizational purpose.

22.     Violations of the standard conditions of the General Permit are actionable by citizens under the CWA pursuant to 33 U.S.C. section 1365(f)(7).

23.     A subset of EDEN's current and identifiable associational members reside, work and/or recreate near the Sacramento River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for the storm water run-off at the AIRGAS facility), and regularly use those waters and their watersheds for kayaking, canoeing, boating, fishing, swimming, hiking, cycling, bird watching and observing other animal species in nature, photography, nature walks and other recreational purposes.

24.     A subset of EDEN's current and identifiable associational members described in paragraph 23 above are all persons for whom the aesthetic and recreational value of the Sacramento River has been diminished and/or impaired on an ongoing and continuous basis as a

direct result of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility, as described herein.

26. 25. The subset of Plaintiff's current and identifiable associational members referred to in paragraphs 23-24 above are all persons who have actual knowledge of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility, as described herein.

26. The subset of Plaintiff's current and identifiable associational members referred to in paragraphs 23-25 above are all persons who believe that Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility, as described herein, have directly contributed to (a) the increase of pollutants and contamination in the Sacramento River downstream from the facility; (b) injury to, deformation and toxicity of the aquatic life in that portion of the river; and (c) a reduction in the number of birds and other wildlife existing in the area.

27. The subset of Plaintiff's current and identifiable associational members referred to in paragraphs 23-26 above are all persons who intend to return to the Sacramento River to recreate, albeit with a diminished desire and aesthetic enjoyment, directly attributable to Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility, as described herein.

28. The subset of Plaintiff's current and identifiable associational members referred to in paragraphs 23-27 above are all persons who no longer wish to immerse their bodies in the portion of the Sacramento River downstream from the AIRGAS facility because of their actual knowledge of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to pollution and degradation of water quality in the Sacramento River since at least July 1, 2019, and concerns over potential adverse health effects caused by swimming in the river.

29.     The subset of Plaintiff's current and identifiable associational members referred to in paragraphs 23-28 above are all persons who no longer wish to consume any fish caught from the Sacramento River because of their actual knowledge of Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility, as described herein, their belief that Defendants' ongoing violations proximately caused or contributed to pollution in the Sacramento River since July 1, 2019, and concerns over potential adverse health effects of consuming fish caught from the Sacramento River.

30.     A subset of Plaintiff's current and identifiable associational members described in paragraphs 23-29 above are all persons who have experienced informational injuries directly resulting from Defendants' ongoing violations of the CWA and the standard conditions of the General Permit at the AIRGAS facility, as described herein.

31.      The informational injuries sustained by Plaintiff's current and identifiable associational members as described in paragraphs 23-30 above constitute a deprivation of the rights of the referenced persons to obtain complete and accurate information regarding Defendants' compliance with standard conditions of the General Permit at the AIRGAS facility, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

32.     One of the most important standard conditions of the General Permit is monitoring and reporting, which is comprised of multiple separate requirements.

33.     The first step requires Dischargers to conduct a pollutant source assessment by identifying in their SWPPP all industrial materials and chemicals present at their facility.  For each industrial material/chemical identified, the Discharger is required to designate an indicator pollutant as an additional sampling parameter if the material in question has any potential to commingle with stormwater.  This ensures that Dischargers are testing their stormwater for all potential pollutants likely to be present in their stormwater runoff.

34.     The next step is to designate locations for collecting stormwater samples which are representative of industrial activity.  This means that a Discharger must collect stormwater

samples from areas of the facility that are likely to show the presence of pollutants from outdoor industrial activities conducted by the Discharger.

35.     The General Permit requires Dischargers to segregate the facility into separate drainage areas, defined by the direction of stormwater flowing to a common area.  Stormwater encompasses both surface flow (above ground) and that which enters drain inlets and flows through underground conveyances.  Drainage areas are also defined by the layout of facility in terms of the location of buildings, structures, ground elevations, grading and stormwater conveyances.

36.     The Discharger is then required to designate at least one representative stormwater sampling location for each of the segregated drainage areas.

37.     The AIRGAS facility in Sacramento, California produces toxic chemicals and gases.  Plaintiff is informed and believes that the following unmonitored pollutants are present at the AIRGAS facility:  Mercury, Cadmium, Chromium, Ammonia, Lead, Chlorine, Silica, Volatile Organic Compounds (VOCs), Manganese, Total Petroleum Hydrocarbons (TPH), Chemical Oxygen Demand (COD), Asbestos, Copper, Zinc, Calcium and Sulfur.

38.     As described in this complaint and the attached Notice, to date Defendants have not yet conducted an adequate pollutant source assessment for the AIRGAS facility and have not segregated the AIRGAS facility into separate drainage areas and depicted those drainage areas on the AIRGAS Site Map.

39.     Since July 1, 2019, Defendants have not collected stormwater from all required areas of the AIRGAS facility and have not tested the facility's stormwater for all required pollutants.

40.     In addition, Defendants' housekeeping practices at the AIRGAS facility are extremely deficient on an ongoing and continuous basis and include allowing toxic pollutants to enter onsite storm drains which flow into the Sacramento River; failing to clean up spills of toxic industrial materials; maintaining uncovered waste bins; significant outdoor storage of scrap, wood, plastic, tires, metal, empty corroded gas cylinders containing asbestos and broken

machinery directly on the ground without cover; storing hazardous chemical containers directly on the ground without secondary containment (some of them open); failing to clean up rust and industrial material particles on rooftops; and trash, dirt and debris; and significant staining on the ground from tire tracking, rust and industrial chemicals, as depicted in Plaintiff's Notice attached as **Exhibit A** hereto.

41.     Another standard condition of the General Permit is that all Dischargers must upload to the SMARTS publicly accessible database system all stormwater sampling analytical data, SWPPPs and Site Maps, Annual Reports and Exceedance Response Reports.

42.     The purpose of this requirement is to allow the general public to assist the regulatory agencies with monitoring Dischargers' compliance with the standard conditions of the General Permit.

43.     The General Permit also requires Defendant JAVONY SPARKS, the designated legally responsible person for AIRGAS, to certify under penalty of law that every document uploaded to SMARTS is true, correct and complete.

44.     As set forth in more detail herein, Defendant JAVONY SPARKS has personally uploaded and certified documents to SMARTS which contain objectively false information, including Annual Reports which provide false explanations for Defendants' failure to collect stormwater samples at the AIRGAS facility; and a false and deficient SWPPP which includes objectively false information related to drainage, stormwater flow, drain inlets, discharge locations, industrial materials handled at the facility, and storm water flow/sampling locations.

45.     Even more horrific to Plaintiff's associational members is the fact that the AIRGAS facility continuously and on a daily basis utilizes in its onsite production of toxic chemicals and gases large amounts of an industrial material called "Monkey Dust."

46.     Monkey Dust is Silica laced with Mercury.

47.     Records obtained from public agencies by representatives of Plaintiff confirm that tons of Mercury-laced Monkey Dust have been hauled away from the AIRGAS facility since

July 1, 2019.   These specific records are attached to Plaintiff's Notice (**Exhibit A** hereto) as **Attachment 6**.

48.     As explained in more detail in Plaintiff's Notice attached hereto as **Exhibit A**, Defendant JAVONY SPARKS intentionally lied to the Water Board and the general public by completing, uploading, signing and certifying as true and correct under penalty of law Annual Reports to SMARTS on July 20, 2023; July 3, 2024; and most recently on July 10, 2025.

49.     Defendant JAVONY SPARKS claimed in AIRGAS' Annual Reports referred to in paragraph 48, above, which he personally certified as true and correct under penalty of law that Mercury was not present at the AIRGAS facility.

50.     However, at the time that Defendant JAVONY SPARKS certified under penalty of law that Mercury was not present at the AIRGAS facility, he possessed personal knowledge that large amounts of Mercury-laced Monkey Dust were continuously present at the AIRGAS facility.

51.     Specifically, on July 7, 2023, Defendant JAVONY SPARKS completed and signed Hazardous Waste Manifest forms maintained by the California Department of Toxic Substances Control which confirmed that large amounts of Mercury were being hauled away from the AIRGAS facility by licensed hazardous waste haulers.

52.     By submitting these objectively false statements to the Water Board and the general public, to date Defendants have completely avoided the mandatory CWA requirement and General Permit standard condition of testing stormwater at the AIRGAS facility for the parameter of Mercury.

53.     This is even more egregious given that AIRGAS' Receiving Waters (the body of water that receives polluted stormwater runs off from the AIRGAS facility) are impaired for the parameter of Mercury.

54.     As explained in more detail in Plaintiff's Notice attached hereto as **Exhibit A**, Defendant JAVONY SPARKS intentionally lied to the Water Board and the general public by including objectively false statements in the AIRGAS facility's SWPPP/Site Map submitted to

SMARTS on July 3, 2024, which he personally signed and certified in SMARTS as true and correct under penalty of law.

55.     The SWPPP and Site Map personally certified in SMARTS by Defendant JAVONY SPARKS intentionally omitted a discussion of all industrial processes occurring at the AIRGAS facility, as well as a list of all industrial chemicals and materials handled onsite, and included an inaccurate list of the manner in which the industrial materials that were discussed in the SWPPP are utilized at the AIRGAS facility, including the locations where they were handled at the facility.  Defendants were required pursuant to General Permit Section X to include this information in AIRGASs SWPPPs.

56.     As a result of Defendants' intentional misrepresentations as articulated above, Defendants have been able to avoid the mandatory responsibility pursuant to the CWA and General Permit of testing the AIRGAS facility's stormwater for all pollutants handled at the facility which could potentially come into contact with stormwater, in violation of the standard conditions of the General Permit.

57.     As explained in more detail in Plaintiff's Notice attached hereto as **Exhibit A**, Defendant JAVONY SPARKS intentionally lied to the Water Board and the general public in AIRGAS' SWPPP and Site Map he certified as true and correct and submitted to SMARTS on July 3, 2024, by misrepresenting that all stormwater falling on the AIRGAS facility was conveyed to an onsite bioswale, when he knew or should have known that this representation was false.

58.     As explained in more detail in Plaintiff's Notice attached hereto as **Exhibit A**, Defendant JAVONY SPARKS intentionally lied to the Water Board and the general public in AIRGAS' SWPPP and Site Map he certified as true and correct and submitted to SMARTS on July 3, 2024, by misrepresenting the number, locations and underground connections and conveyances related to drain inlets located at the AIRGAS facility, when he knew or should have known that these representation were false.

59.    As a result of Defendants' intentional misrepresentations as articulated above, Defendants have to date been able to avoid the mandatory responsibility pursuant to the CWA and General Permit of collecting stormwater from all industrial discharge locations present at the AIRGAS facility, in violation of the standard conditions of the General Permit.

60.    Defendants' failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's associational members referred to in the paragraphs above from: (a) accessing on SMARTS the true operational facts relevant to Defendants' facility; and (b) acquiring accurate and complete data related to the unmonitored pollutants emanating from the AIRGAS facility during rain events and discharging into the Sacramento River.

61.    As such, Plaintiff's current and identifiable associational members referred to in the paragraphs above are unable to fully assess the extent of the General Permit violations at the AIRGAS facility, as well as the types and levels of pollutants entering the affected waterways, due to Defendants' willful violations of the standard conditions of the General Permit at the AIRGAS facility; or to gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

62.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above have been members of EDEN since at least the date of Plaintiff's Notice to Defendants.

63.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are individuals who have all experienced an ongoing, continuous, concrete, personal, specific, actual or imminent, non-speculative injury-in-fact commencing on and after July 1, 2019, arising directly from Defendants' failure to comply with the standard conditions of the General Permit at the AIRGAS facility, as articulated herein.

64.    The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs above are all persons who would have standing to file this suit by themselves as individual plaintiffs.

65.     The subset of Plaintiff's current and identifiable associational members referred to in the paragraphs  above are all persons who will not be required to personally participate in this lawsuit.

66.     The ongoing and continuous injuries sustained by the subset of EDEN's current and identifiable associational members described in the foregoing paragraphs will be adequately redressed by a judicial decision in this matter granting Plaintiff the injunctive relief requested herein.

67.     Defendants do not need to know the identity of any of Plaintiff's current and identifiable associational members described in the paragraphs above to understand and respond to this Complaint.

## V. <u>STATUTORY BACKGROUND</u>

68.     Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

69.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into Waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act.  33 U.S.C. § 1342

70.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water Dischargers. 33 U.S.C. § 1342(p)

71.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

72.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1)

73.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

74.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

75.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

76.     Violations of the provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

A. **General Permit**

77.    The Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016)

78.    The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

79.    The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

80.    A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm water/igp_20140057dwq.html

81.    The General Permit includes both absolute *discharge prohibitions* and substantive and procedural *standard condition* provisions.

82.    To discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Notice of Intent to Discharge Storm water ("NOI") and an initial Storm Water Pollution Prevention Plan ("SWPPP") and Site Map.

83.    The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

1.  **SMARTS Compliance Database**

84.    The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers enter and manage storm water data associated with General Permit compliance.

85.    SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Dischargers' compliance with the General Permit and to pursue Dischargers who fail to comply, utilizing the citizen's suit provision of the CWA.

86.    SMARTS can be accessed at `California Stormwater Multiple Applications and Report Tracking System`.

87.    The General Permit requires Dischargers to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Notices of Intent to Discharge Storm Water, Storm Water Pollution Prevention Plans and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

2.  **Standard Conditions of the General Permit**

88.    The General Permit contains a variety of substantive and procedural standard conditions.

89.    The General Permit requires that Dischargers comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

90.    The primary standard conditions of the General Permit include the following:

(a)    Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)    Implementing and maintaining *Best Management Practices*;

(c)     Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)     Collecting and analyzing *storm water runoff samples* four times per year;

(e)     Collecting the *storm water samples during qualified storm events, from all discharge locations, in all drainage areas* in places which are representative of industrial operations;

(f)     Testing collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)     Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)     Preparing compliant *Exceedance Response Reports* in the event that storm water sampling data confirms an annual exceedance of any sampling parameter within the specified time limits, and certifying and submitting the reports to SMARTS;

(i)     Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS;

(j)     Establishing a *Pollution Prevention Team* of at least two on-site employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit; and

(k)     Ensuring that all documents submitted to SMARTS are certified by an eligible legally responsible person or duly authorized representative and comply with the certification that the contents of the documents are true and correct under penalty of law.

SWPPP and Site Map Requirements

91.     All Dischargers are required to develop and implement a Storm Water Pollution Prevention Plan.

92.     The main objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the Discharger's facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with

industrial activities in storm water discharges and authorized non-storm water discharges. General Permit § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

93. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

94. Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

95. Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of a pollution prevention team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a description of potential pollutant sources; an assessment of potential pollutant sources (specifically, whether the pollutants have the potential to commingle with storm water); a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and discharge points and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges. General Permit §§ X(A)-X(I)

96. The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table. General Permit § X(H)(4), (5)

97. Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water discharges, locations of storm water collection and conveyance systems, associated discharge locations, sampling

locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas.  General Permit § X(E)

### Best Management Practices

98.    The General Permit requires all Dischargers to implement and maintain the following minimum Best Management Practices to reduce or prevent pollutants in industrial storm water discharges at their facility: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping. General Permit § X(H)(1)

99.    The General Permit further requires Dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit § X(H)(2)

100.    Failure to implement minimum and advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

### Monitoring and Reporting/Storm Water Sampling and Analysis

101.    The General Permit requires Dischargers to develop and implement an adequate Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

102.    As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce storm water discharges, evaluate the effectiveness of BMPs in

reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

103.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

104.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

105.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit §§ XI(B)(8), XI(B)(11)

106.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit § XI(B)(6)(c)

107.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations are conducting during dry weather and must include observing each drainage area for the presence of non-storm water discharges; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and all other potential sources of industrial pollutants, and monitoring BMPs for effectiveness. Sampling event visual observations are conducted at the same time as sampling occurs at a discharge location and must include observing storm water discharges for the presence or

absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris and sources of any discharge pollutants.  General Permit § XI(A)

108.    The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.

109.    The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

110.    The NALs established under the General Permit for pollution parameters applicable to all Dischargers are set forth in Table 2, which is incorporated herein by reference.

<u>NAL Exceedances-Exceedance Response Actions</u>

111.    An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than the annual NALs, which are listed on Table 2 of the General Permit. The reporting year runs from July 1 to June 30.

112.    An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A), Table 2

113.    When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status" commencing July 1 of the reporting year following the entry into Level 1 status.

114.    Once a Discharger has entered Level 1 Status, by October 1 following commencement of Level 1 status, it must conduct a thorough facility evaluation with the assistance of a Qualified Industrial Stormwater Practitioner (QISP) of all drainage areas to

determine the industrial pollutant sources at the facility that are or may be related to the exceedance(s), and identify the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future exceedances.   General Permit § XIII(C)

115.    By January 1 following commencement of Level 1 status, the Discharger must revise its SWPPP, implement any additional BMPs identified in the evaluation, and certify and submit to SMARTS a Level 1 Exceedance Response Action (ERA) Report.  General Permit § XIII(C)

116.    If a discharger exceeds an applicable NAL during Level 1 Status, it is elevated to "Level 2 Status."  General Permit §XII(D)

117.    On January 1 of the reporting year following entry into Level 2 Status, a Discharger is required to submit to SMARTS a Level 2 ERA Action Plan identifying its selection of one of three options to remediate the continuing exceedances: implementation of additional BMPs, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  The Action Plan must also include a schedule for completion of the tasks.  General Permit § XII(D)(1)

118.    On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, the Discharger is required to submit a Level 2 Technical Report demonstrating its efforts to implement the additional BMPs or confirming the non-industrial sources of the pollutants causing the exceedances.  General Permit § XII(D)(2)

Annual Comprehensive Facility Evaluation

119.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  General Permit § XV

Annual Reports

120.    Section XVI(A) of the General Permit requires all Dischargers to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

121.    Annual Reports are auto populated by SMARTS from Dischargers' answers to a series of twelve questions, which require mostly yes/no responses.

122.    The questions include whether the Discharger has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all discharge locations at its facility; and where the facility is located within an impaired watershed, the Discharger has assessed whether any of the receiving water impairments are potential pollutants present at their facility.

123.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

<u>Certification of Compliance Documents</u>

124.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## VI.  SPECIFIC FACTUAL ALLEGATIONS

### A.  The Facility

125.    Plaintiff is informed and believes that the AIRGAS facility (which produces toxic chemicals and gases) falls under standard industrial classification ("SIC") code 2899-Chemicals and chemical preparations, NEC, based on public records.

126.    SIC Code 2899 is included in Attachment A of the General Permit as a type of industrial operation that requires application for and receipt of General Permit coverage.

127.    The AIRGAS facility stores and handles a large amount of industrial chemicals and materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

128.    During rain events, storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility settle onto the ground.

129.    Storm water flowing over these areas collects suspended sediment, dirt, metals, and other chemicals and toxic pollutants as it flows towards the AIRGAS facility's storm water channels, and discharges from the Facility into its Receiving Waters.

### B.  The Facility's Receiving Waters

130.    Based on Plaintiff's investigation, including but not limited to a review of the AIRGAS facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"); SWPPP and Site Map, aerial photography and drone footage; federal, state and local regulatory agency mapping tools; and eyewitness reports, storm water leaves the boundaries of the AIRGAS facility and enters Florin, Elder and Morrison Creeks, via both the City of Sacramento MS4 and surface flow, before discharging to the Sacramento River, a navigable Water of the United States.

131.    On July 3, 2024, Defendant JAVONY SPARKS certified under penalty of law to the Water Board and the general public via SMARTS that storm water discharges from the

AIRGAS facility enter Morrison Creek. (See **Exhibit B**, attached hereto and incorporated herein by reference)

### C. Defendants' General Permit Violations

### Deficient SWPPP/Failure to Follow and Update SWPPP

132.    As is more particularly described in Sections III.A and III.B of Plaintiff's Notice attached as **Exhibit A** hereto and incorporated herein by reference, Plaintiff alleges that since at least August 30, 2021, Defendants have failed to implement an adequate SWPPP for the AIRGAS facility and have failed to comply with the terms of AIRGAS' deficient SWPPPs, in violation of the standard conditions of the General Permit. General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

133.    Defendants' continuing failure to implement and follow an adequate SWPPP at the AIRGAS facility is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

134.    Defendants' continuing failure to implement an adequate SWPPP at the AIRGAS facility is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

135.    According to information available to Plaintiff, AIRGAS' current SWPPP has not been evaluated to ensure its effectiveness and has not been revised as required by the General Permit to reflect true conditions at the Facility and to prevent discharges of contaminated storm water.

136.    According to information available to Plaintiff, AIRGAS' current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; discharge locations and mandatory

sampling points; the type, amount and location of industrial materials and chemicals handled at the facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

137.    Plaintiff alleges that AIRGAS' SWPPP and Site Map do not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT.

138.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continue to fail to alter the AIRGAS facility's SWPPP/Site Map to comply with the requirements of the General Permit.

139.    In addition, Plaintiff alleges that Defendants have failed to comply with the provisions of AIRGAS' current SWPPP in the areas of monitoring and reporting.

140.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Sacramento River, by way of Florin, Elder and Morrison Creeks.

141.    Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to AIRGAS' deficient SWPPP/Site Map are ongoing and continuous.

**Monitoring and Reporting/ Storm Water Sampling**

142.    As is more particularly described in Section III.C of the Notice attached hereto as **Exhibit A** and incorporated herein by reference, Plaintiff alleges that since July 1, 2019, Defendants' monitoring and reporting program at the AIRGAS facility in Sacramento has been deficient and remains in ongoing and continuous violation of mandatory standard conditions of the General Permit.

143.    Defendants' deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

144.    Defendants' deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and

government agencies, as well as other relevant documents maintained by Defendants and governmental and regulatory agencies.

**Falsification of Annual Reports, SWPPPs and Site Maps**

145.    As is more particularly described in Section III.D of the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference, since July 1, 2020, Defendants have certified and submitted intentionally misleading, incomplete and falsified Annual Reports, SWPPPs and Site Maps to the Water Board and general public via SMARTS, in violation of the standard conditions of the General Permit,.

146.    Defendants' submission of false Annual Reports, SWPPPs and Site Maps, and its continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants.

147.    Defendants' submission of false Annual Reports Annual Reports, SWPPPs and Site Maps is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

148.    Defendants' submission of false statements to the Water Board and the general public is ongoing and continuous.

**Failure to Implement BAT/BCT; BMP Deficiencies**

149.    As is more particularly described in Section III.D of the Notice and depicted in photographs attached to the Notice attached hereto as **Exhibit A,** which is incorporated herein by reference, since July 1, 2019, Defendants have failed to identify and implement Best Management Practices ("BMPs") at the AIRGAS Facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants.

150.    These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

151.    Defendants' failure to implement proper minimum BMPs at the AIRGAS facility is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

152.    The BMP deficiencies at the AIRGAS facility are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendants, as well as by required documents which have not been uploaded to SMARTS.

153.    The BMP deficiencies at the AIRGAS facility are also evidenced by eyewitness reports, photographs and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

154.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the AIRGAS facility into the Sacramento River.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

155.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

156.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP, including a Site Map.

157.    As outlined herein, since August 30, 2021, Defendants have continuously failed to develop and implement an adequate SWPPP for the AIRGAS facility.

158.    Each day since August 30, 2021, that Defendants have failed to develop, implement and update an adequate SWPPP for the AIRGAS facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

159.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

160.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

161.    The General Permit requires Dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

162.    As outlined herein, since July 1, 2019, Defendants have continuously failed to develop and implement an adequate monitoring and reporting program for the AIRGAS facility.

163.    Each day since at least July 1, 2019, that Defendants have failed to develop and implement an adequate monitoring and reporting program at the AIRGAS facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

164.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop and implement a compliant monitoring and reporting program at the AIRGAS facility.

**THIRD CAUSE OF ACTION**
**Submission of False Reports and SWPPPs to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

165.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

166.     Section XVI of the General Permit requires that Annual Reports and SWPPPs/Site Maps submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information.

167.     As delineated herein, on August 30, 2021; and again on July 3, 2024, Defendants made false representations in the AIRGAS Facility's SWPPPs and Site Maps certified as true and correct in SMARTS and have failed to correct or retract the false statements.

168.     Furthermore, on July 1, 2020; July 15, 2021; June 24, 2022; July 20, 2023; July 3, 2024; and July 10, 2025, Defendants certified and submitted to SMARTS misleading and false Annual Reports and have failed to correct or retract the false statements, in violation of General Permit Sections XI(B) and XVI.

169.     Each time since July 1, 2020, that Defendants submitted false or misleading SWPPPs, Site Maps or Annual Reports to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

170.     These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' failure to withdraw any of the false SWPPPS and Annual Reports submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

171.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  The General Permit's SWPPP requirements and Effluent Limitation V(A) of the

General Permit require Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Management Practices (BMPs), including Best Available Treatment (BAT) for toxic and nonconventional pollutants and Best Conventional Treatment (BCT) technologies for conventional pollutants.

172.    As alleged herein, since July 1, 2019, Defendants have continuously failed to implement BAT and BCT at the AIRGAS facility for discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

173.    As alleged herein, Defendants have failed to implement the required minimum Best Management Practices at the Facility.

174.    Each day since at least July 1, 2019, that Defendants have failed to implement the required minimum BMPs and to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

175.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and maintain adequate BMPs at the AIRGAS Facility.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendants to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendants to immediately operate the AIRGAS Sacramento facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA.  Specifically, Plaintiff requests an Injunctive Order requiring Defendants to do the following:

a.    Develop, implement and upload and certify to SMARTS a SWPPP and Site Map that complies with all aspects of the General Permit, with (i) a pollutant source assessment that includes all industrial materials and chemicals handled at the facility, as well as the true manner in which the materials are handled and the accurate locations; (ii) an accurate description and depiction of onsite drainage and stormwater flow;  (iii) a site map which segregates the facility in discrete drainage areas and designates at least one sampling location for each drainage area; and (iv) a site map which accurately depicts all onsite drain inlets and underground conveyances and connections, as well as all areas of industrial operation.

b.    Maintain a compliant monitoring and reporting program, including (i) testing the AIRGAS facility's stormwater for all pollutants handled onsite which could commingle with stormwater, including at a minimum Total Suspended Solids, pH, Oil & Grease, Iron, Aluminum, Nitrates, Mercury, Cadmium, Chromium, Chlorine, Ammonia, Lead, Silica, Copper, Zinc, Volatile Organic Compounds, Total Petroleum Hydrocarbons and Chemical Oxygen Demand;  (ii) collecting stormwater samples from all discharge locations at the AIRGAS facility; (iii) complying with all mandatory sampling protocols; and (iv) conducting monthly and sampling visual inspections and maintaining records of same for five (5) years.

c.    Develop and implement proper Best Management Practices at the facility, including rectifying the deficient housekeeping practices depicted in the photographs attached to Plaintiff's Notice; and

d.    Retracting the Annual Reports submitted to SMARTS which contain false information and resubmitting them with true and correct information and refraining from certifying in the future any document to SMARTS which is not true and correct.

3.    Enjoin Defendants from discharging pollutants to the surface waters surrounding its facility until such time as Defendants have developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.      Order Defendants to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.      Order Defendants to take appropriate actions to restore the quality of United States waters impaired by activities at the AIRGAS facility;

6.      Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

8.      Award such other and further relief as may be just and proper.


Dated:  July 19, 2025                              Respectfully,



By: ___/S/_Adam D. Brumm_____
        Adam D. Brumm
        Attorney for Plaintiff